UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

CHRISTOPHER E. JAMES,

                Petitioner,             **MEMORANDUM & ORDER**

                                        22-cv-1120(KAM)

     -against-


MICHAEL D'AMORE, Superintendent of
Marcy Correctional Facility[1],

                Respondent.

--------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

    Petitioner Christopher James ("Petitioner") currently incarcerated in the custody of the New York State Department of Corrections and Community Supervision, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On October 26, 2018, Petitioner was convicted after a jury trial of murder in the second

_____

[1] The proper respondent in a federal habeas action is the warden or superintendent of the facility where the petitioner is currently in custody. *Green v. Lee*, 964 F. Supp. 2d 237, 253 (E.D.N.Y. 2013). The original respondent in this action was "Ms. Macintosh," the Superintendent of Clinton Correctional Facility when the action was filed. (*See* Pet. at 1.) The Court, upon the motion of Petitioner, deems the Petition amended to change the respondent to the Superintendent of Marcy Correctional Facility, where Petitioner is currently held. (*See* ECF No. 35, Motion to Change Caption.) The Court retains subject-matter jurisdiction because Petitioner was convicted and sentenced in the Eastern District of New York. *See* 28 U.S.C. § 2241(d). The Court takes judicial notice of the name of the current superintendent of Marcy Correctional Facility. *See* Department of Corrections and Community Supervision Facilities: https://doccs.ny.gov/location/marcy-correctional-facility (last visited February 1, 2024).

degree (N.Y. Penal Law § 125.25(1)).  (*See* ECF No. 1, Petition for Writ of Habeas Corpus ("Pet."), at 1; ECF No. 15, State's Affidavit in Opposition ("State Opp."), at ¶77.)  On November 30, 2018, the trial court sentenced Petitioner to an indeterminate prison term of 25 years to life for the murder.  (Pet. at 2.)  The Petitioner claims that (1) the trial court violated his constitutional right to a speedy trial, (2) the trial court violated his constitutional right to counsel by allowing him to represent himself *pro se* despite his "distorted" state of mind, (3) his retrial following an initial mistrial violated the double jeopardy clause of the Fifth Amendment, (4) the trial court erroneously ruled on an evidentiary issue between his first and second trial, (5) the trial court denied his right against self-incrimination, and (6) he is a sovereign and his arrest was a violation of federal law.  (Pet. at 5, ECF No. 6, Petitioner's Letter[2] ("Pet. Letter"), at 1-3.) For the reasons set forth below, the petition is respectfully DENIED.

---

[2] In light of Petitioner's *pro se* status, the Court construes Petitioner's subsequent letter as a supplement to the original petition, as opposed to a second or successive *habeas* petition, and considers all of the claims raised in both documents together, mindful of the mandate to liberally construe *pro se* filings.  *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007)

**BACKGROUND**

**I.   Factual Background[3]**

At trial, the prosecution presented evidence showing that on February 10, 2010, Petitioner stabbed Kevin Pierson ("Mr. Pierson" or the "victim") to death inside his apartment at 4 Maple Wing Drive, Central Islip, New York.  (State Opp. at ¶¶8, 25.) Subsequently, on February 12, 2010, a cousin of Mr. Pierson reached out to relatives who lived nearby in Central Islip to alert them that he had not heard from Mr. Pierson and asking if they could check on him.  (*Id.* at ¶23.)  Mr. Pierson's nephew went to his apartment to check on him, and, upon finding the door unlocked, opened the door and observed blood and a painting askew in the foyer.  (*Id.* at ¶24.)  Mr. Pierson's nephew alerted the police, who subsequently arrived at the scene, found Mr. Pierson deceased, and began their investigation.  (*Id.* at ¶¶24-25.)

Among the items recovered from the crime scene was a jacket with a knife sheath in the left pocket.  (*Id.* at ¶40.)  In addition, the crime scene investigators found a sock-clad impression of a footprint at the crime scene, which was made by an individual's bare foot with a sock on, stepping in a stain and leaving the impression with a weave pattern of the sock.  (*Id.* at ¶48.)  To

---

[3] Because Petitioner was convicted, the court summarizes the facts in the light most favorable to the verdict.  *See United States v. Wasylyshyn*, 979 F.3d 165, 169 (2d Cir. 2020) (citing *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012)).

preserve the foot impression, one of the investigators took examination-quality photographs with scales. (*Id.*) Investigators also took DNA samples from the jacket with the knife sheath, and specifically from a portion of the jacket not stained with blood: the cuff. (*Id.* at ¶¶53-54.)

In 2013, Detective Michael Mahan of the Suffolk County Police Department's Homicide Squad received notice of a DNA match to Petitioner on the jacket recovered at the crime scene. (*Id.* at ¶71.) Detective Mahan had previously spoken to an individual claiming to be Petitioner in April 2010 while calling contacts on the victim's cell phone. (*Id.*) After conducting a background investigation and learning of an address for Petitioner in Binghamton, New York, the Suffolk County District Attorney's Office and Detective Mahan made the decision to arrest Petitioner. (*Id.* at ¶73.)

On April 24, 2016, Detective Mahan and other officers from the Suffolk County Police Department arrested Petitioner as he was departing a residence in Binghamton, New York. (*Id.* at ¶¶9,75.) Petitioner was provided *Miranda* warnings, brought first to the Binghamton Police Department, and subsequently back to Suffolk County to conduct post-arrest processing. (*Id.* at ¶¶10-12.) During his transportation back to Suffolk County, Petitioner made

4

several statements to investigators of his own accord, including some that were inculpatory.  (*Id.* at ¶¶12-17.)

## II.   Pre-trial Proceedings

### A. Pre-trial *Huntley* Suppression Hearing

On November 29, 2016, Petitioner appeared with counsel in County Court in Suffolk County for a *Huntley* hearing regarding Petitioner's motion to suppress his conversations with Detective Mahan on April 7, 2010, and April 24, 2016.  (ECF No. 18-13, Huntley Hearing Transcript ("*Huntley* Tr."), at 2-3.)[4]  Detective Mahan provided testimony recounting his conversations with Petitioner on both dates.  (*Id.* at 6-24.)

Detective Mahan testified that he responded to the crime scene in Central Islip on February 12, 2010, and subsequently examined the phone of the victim, Mr. Pierson.  (*Id.* at 7-8.)  Mr. Pierson had called a contact, "Briss," nine times on February 10, 2010, and texted the contact 14 times on the same day.  (*Id.* at 8.) Detective Mahan called the contact on April 7, 2010, and eventually received a call back later that day from the same number.  (*Id.* at 9-10.)  Detective Mahan testified that the individual returning his call said his name was Christopher James, and that he was 19 years old.  (*Id.* at 10.)  Detective Mahan described the conversation with Petitioner on April 7, 2010 as follows:

---

[4] All pin citations to the record refer to the page number assigned by the court's CM/ECF system.

5

> I told him I wanted to speak to him about Kevin
> [Pierson], if he knew Kevin [Pierson]. He said he did.
> He said he had met him the prior summer. He said he
> used the nickname or went by the nickname of Web. . . .
> I asked him when he first met with Mr. [Pierson]. He
> said he first met Mr. [Pierson] at a club in downtown
> Brooklyn called the Brooklyn House. And he had said he
> had never been to Mr. [Pierson]'s place. He said the
> last time he spoke with Mr. [Pierson] was in February,
> that past February. He said it was the day of the
> blizzard. He said it was 3 or 4:00 in the afternoon. He
> said that Mr. [Pierson] called him looking for company
> and was looking for somebody to hang out. And he said
> that he told him, no, he wasn't going out.

(*Id.* at 10-13.)

Detective Mahan further testified that the next time he spoke with Petitioner was April 24, 2016. (*Id.* at 13.) Detective Mahan explained that he spoke with Petitioner on that day as he was arresting him in Binghamton, New York, and subsequently in the police vehicle as the police transported Petitioner back to Suffolk County. (*Id.* at 13-14.) Detective Mahan testified that he read Petitioner his *Miranda* rights, from a pre-printed form, and that Petitioner responded as follows:

> At that point Mr. James stated, "I don't need a lawyer,
> I didn't do anything wrong." So at that point I
> proceeded with the waiver questions.
>
> "Do you understand each of these rights I've explained
> to you?["] His answer was yes. The second question,
> "Having these rights in mind, do you wish to talk to me
> now?" At which point he said, "I don't think I want to
> talk to you right now."

(*Id.* at 15-18.)   Detective Mahan testified that he then had

Petitioner sign the rights warning, and they began the drive from

Binghamton to Long Island.   (*Id.* at 18-19.)

Detective Mahan testified that Petitioner made the following

statements while in the police vehicle:

> I initially spoke with Mr. James and told him that I
> knew that he was involved in the death of Mr. [Pierson]
> and I was hoping that he would speak with me and tell me
> what happened.
> Basically, he remained silent and looked out the window
> for a period of time.  And the first thing that he said
> to me was, "Why did I have that girl's picture?"  And he
> was referring to a picture of a female that I had
> obtained from the Binghamton Police Department.  And it
> was a picture of a female that he had had a prior
> domestic incident with several months prior.
> I told him that I had the picture because I had
> information that was his girlfriend. He said that wasn't
> his girlfriend.  He said she was pregnant with his baby.
> It was his first child.  He said that she was due in a
> couple of months and that she was nothing to him.
> He said that he had called the police to get her taken
> -- to have her removed from his house.  And she had told
> the police or made [] up a story and he was the one that
> wound up getting arrested.
> Q.  What transpired next in the vehicle?
> A.  After another period of silence, Mr. James turned
> around, looked at me, and asked me if I thought that I
> had — if he had killed Mr. [Pierson].
> Q. What specifically did he say to you?
> A. "You think I killed him," at which time I told him
> yes.  I told him I didn't know the reason why.  I had a
> theory as to why, but unless he told me, I would not
> know for sure.
> At that point, he asked me "What's my theory?"  So I
> proceeded to tell him what my theory was.
> Q. What did you tell him?
> A. I told him that I knew that Mr. [Pierson] was
> bisexual.  I knew that based upon prior — the prior
> telephone conversation that I had with him in the past,
> meaning, Mr. James, where he said that Mr. [Pierson] had

invited him to his place on several occasions.  I thought
that he went to his residence under the pretense that he
was going to hang out with some females.  And upon
arriving there, Mr. [Pierson] made sexual advances
towards him and things went horribly wrong.
Q. What was his reaction to your theory?
A. As I was speaking to him, he was nodding his head in
acknowledgment, tears welled up in his eyes.  And he
said, "That's a great theory. I don't have to tell you
nothing. You know everything that happened."
Q. What happened then?
A. At that point I asked him if he wanted to tell me
what did, in fact, happen and expand on it.  And he just
looked out the window and sat in silence for another
period of time.
Q. And approximately how long did he sit in silence?
A. I would say probably 20 minutes to a half an hour.
Q. And what is the next thing that occurred in the
vehicle?
A. The next thing was he turned around and asked me,
["]Am I being charged with murder?["]  And I told him,
Yes, he was.  At which point he made denials saying,
["]I wasn't there, I was never there.["]
At that point I asked him if he knew what DNA was?  He
didn't answer verbally.  He just shook his head and
acknowledged what it was. And I told him that I knew it
was a lie, that he was not there, because his DNA was
recovered at the crime scene.
Q. What did he say to that?
A. His response was, ["]Oh, shit.["]  And then he said,
["]How can I be charged with murder if no weapon was
recovered?["]
Q. And what did you say in response to his statement
that how could he charged with murder if no weapon was
recovered?
A. I said — I asked him [["]why would you think that no
weapon was recovered?["]  I had never mentioned anything
about that previously to him.  And he just sat in
silence.

(*Id.* at 19-23.)  Detective Mahan continued his testimony by

describing the remainder of his conversation with Petitioner,

which was not directly related to Mr. Pierson's death, and closed

8

by noting that he arrived in Suffolk County with Petitioner at 9:06pm. (*Id.* at 23-25.)  No further conversation regarding the events of February 2010 occurred after that point. (*Id.* at 25.)

The County Court, after the conclusion of the hearing, issued a written decision and order finding the statements made by Petitioner admissible at trial. (ECF No. 18, State Court Record Part I ("Record Pt. I"), at 66.)  The County Court found that both of the statements "were made spontaneously by the defendant" and "were not the result of custodial interrogation." (*Id.* at 68.) Continuing, the County Court found that the Detective "did not physically force the defendant to waive his rights, did not threaten or try to coerce the defendant into making the statements, and made no promises to the defendant which may have created a substantial risk that the defendant might falsely incriminate himself." (*Id.* at 68-69.)  Accordingly, the County Court found the statements would be "admissible at trial." (*Id.* at 69.)

### B. Petitioner's First Trial

The Petitioner's first trial began with jury selection on September 18, 2017. (*See generally* ECF No. 18-2, Trial Transcript for September 18, 2017.)  Petitioner was represented by counsel during this trial, and the jury began deliberations on October 4, 2017. (ECF No. 18-10, Trial Transcript for October 4, 2017, at 166.)  On October 6, 2017, at 4:03pm, the jury sent a note informing

the trial court that they could not reach a verdict.  (ECF No. 18-30, Trial Transcript for October 6, 2017, at 18.)  With the consent of the parties, the trial court read the jury what is referred to as the "*Allen* charge" in New York state court, instructing them to continue their deliberations.  (*Id.* at 18-23.)  Two jurors subsequently indicated that they could not continue deliberating due to work obligations, and the Petitioner, through counsel, consented to discharge and release those two jurors, putting in place Alternates Number 1 and Number 2, instead.  (*Id.* at 28-33.) The trial court explained to the jurors that they would begin deliberations "from scratch[,] from day one" when they returned on October 10, 2017.  (*Id.* at 37-38.)

The trial court further charged the jury when they began deliberations on October 10, 2017, explaining to them that they must began their deliberations "anew, providing [the alternate jurors] an opportunity to participate fully in the deliberations as to each count as well as the verdict."  (ECF No. 18-31, Trial Transcript for October 10, 2017, at 4.)  The next day, on October 11, 2017, the trial court held a conference in chambers with counsel for the prosecution and the defense, as well as a court reporter.  (ECF No. 18-32, Trial Transcript for October 11, 2017, at 2.)  The trial court had one of the jurors on the phone, who was calling from the hospital.  (*Id.*)  The juror was not sure if

10

she would be able to resume deliberating and explained that she planned to call after speaking with her doctor to update the trial court. (*Id.* at 7.)

The trial court asked Petitioner and his counsel what they wished to do with respect to the remaining alternate jurors. (*Id.*) Petitioner's counsel requested that the alternates be discharged, as Petitioner would not consent to either of the remaining two alternates replacing the juror who had called from the hospital. (*Id.* at 7-8.)  The two remaining alternates were discharged, and the parties subsequently held another conference when the ill juror called back with her doctor's instructions. (*Id.* at 9-16.)  The juror noted that her doctor did "not want [her] to return to jury duty" and recommended that she see a cardiologist. (*Id.* at 16-17.)  Subsequently, in open court, the trial court explained to the parties how he planned to proceed:

> We are in a position where clearly [Juror Number 9], is incapacitated and physically unable to proceed with this trial. So even without an application by either side, I'm in a position where I need to declare a mistrial in this case.
> Anybody wish to be heard further before we bring the jury out?

(*Id.* at 21.)  After neither side expressed a wish to be heard, the trial court declared a mistrial and discharged the jury. (*Id.* at 23-24.)

### C. Matters before Petitioner's Second Trial

11

Following Petitioner's first trial ending in a mistrial, defense counsel asked for permission to be relieved, and was replaced with substitute court-appointed counsel with Petitioner's consent. (ECF No. 18-12, Hearing Transcript for October 18, 2017, at 8-9.)  The prosecution subsequently moved the trial court for an order pursuant to New York Crim. Proc. Law ("CPL") 240.40(2)(b)(v) compelling Petitioner to permit the taking of foot impressions on January 26, 2018.  (Record Pt. I, at 121.) Petitioner, through counsel, opposed the motion, but the trial court granted the prosecution's motion for foot impressions on February 13, 2018, finding that probable cause existed to believe that Petitioner committed the crime, and there was a clear indication that relevant material evidence would be found.  (*Id.* at 121-22.)  The trial court further explained that it found "a comparison of the defendant's foot impressions with the evidence obtained from the crime scene-photographs of sock clad bloodied footprints-will yield probative material evidence, whether is it inculpatory or not."  (*Id.* at 122.)

The proceedings were subsequently adjourned on several occasions at Petitioner's request. (*Id.* at 1-2.)  On May 9, 2018, defense counsel requested to be relieved, noting that he had discussed the topic with Petitioner.  (ECF No. 18-19, Hearing Transcript for October May 9, 2018, at 3.)  Petitioner confirmed

12

that he had been able to discuss the topic with his counsel, and explained that defense counsel "told [Petitioner] that he [has] family issues going on so he might be relieved on [Petitioner's] case." (*Id.*)  As the trial court began to explain that replacement counsel had been arranged for Petitioner, Petitioner interjected: "I can represent myself."  (*Id.* at 3-4.)  The trial court stated, "I don't think that's a good idea" but Petitioner reiterated his request.  (*Id.* at 4.)  The court continued and stated that he would schedule a subsequent hearing for May 14, 2018, where the newly appointed counsel would be present, and Petitioner could speak with him on the topic.  (*Id.* at 5.)

On May 14, 2018, Petitioner had the opportunity to speak to newly appointed defense counsel, but maintained that he wished to proceed *pro se*.  (ECF No. 18-20, Hearing Transcript for May 14, 2018, at 2-3.)  The trial court explained to Petitioner the dangers of proceeding in such a manner, and the following discussion took place:

> THE COURT: Listen, you sat here throughout -- you sat here throughout that trial.  You saw what is necessary to represent somebody.  And although you're probably an intelligent young fellow, you're not a lawyer, and you really don't know -even though you have been through the trial once and you know basically what is coming, there [are] some additional things that have taken place since the trial ended that, quite frankly, only a lawyer has the ability to comprehend.  So I just think it's a bad idea for you to represent yourself.

13

> THE DEFENDANT: Can I say this, your Honor? I remember
> when you charged the jury you said me, the defendant,
> doesn't have to disapprove or approve of anything --
> THE COURT: You don't have to prove or disprove anything.
> THE DEFENDANT: -- it's all on the DA.
> THE COURT: Yes.
> THE DEFENDANT: So let the burden remain on her.  I just
> want to go to trial.  That's what I want to do.

(*Id.* at 3-4.)  After further discussion about Petitioner's desire to proceed to trial, the trial court explained that the parties would discuss the matter further at a conference on May 16, 2018. (*Id.* at 8.)

At the conference on May 16, 2018, the trial court explained to Petitioner, after confirming he still wished to proceed *pro se*, that "before permitting you to give up that right and proceed as your own lawyer, I must decide whether you fully understand the significance and consequences of doing so."  (ECF No. 18-21, Hearing Transcript for May 16, 2018, at 6.)  The trial court allocuted the Petitioner by inquiring as to Petitioner's educational background, employment history, medical history, and further discussed the "the dangers of proceeding without a lawyer and the reasons our law favors that you be defended by a lawyer." (*Id.* at 6-10.)  The trial court further explained the disadvantages Petitioner would face, and asked if Petitioner understood.  (*Id.* at 10-13.)  The trial court particularly emphasized the following:

> THE COURT: In particular, it is difficult to deliver an
> opening and summations where you'll likely have to speak
> about your alleged conduct and in doing so, you run the

14

> risk of saying something in such a way as to make it
> appear you are guilty.
> Do you understand that?
> THE DEFENDANT: Yes.
> THE COURT: Likewise, a defendant who represents himself
> and must ask questions about his conduct runs the risk
> that he will frame a question in such a way as to make
> it appear he's guilty.
> Do you understand that?
> THE DEFENDANT: Yes.

(*Id.* at 13-14.)   The trial court continued with the examination, and further warned Petitioner regarding the risks of self-representation.   (*Id.* at 14-27.)   The trial court concluded by stating to Petitioner that "you seem to me to be an intelligent individual, and you're making a decision that is not terribly intelligent [to proceed *pro se*], that's my concern.   Would you reconsider at all?" (*Id.* at 25.)   Petitioner replied, "I wish not to."   (*Id.*)   At the conclusion of the hearing, the trial court scheduled a subsequent hearing for May 21, 2018, to discuss timing for Petitioner's second trial.   (*Id.* at 28-31.)

Subsequent hearings were held to ensure that Petitioner had access to his case file as well as a legal advisor.   At the final pre-trial conference prior to Petitioner's second trial, on September 10, 2018, Petitioner raised two concerns with the trial court. (ECF No. 18-26, Hearing Transcript for September 10, 2018, at 3.)   First, Petitioner claimed that his right to a speedy trial had been violated because more than 180 days had elapsed since October 18, 2017.   (*Id.* at 3-5.)   Second, Petitioner argued that

15

his double jeopardy rights were being violated because jeopardy
had attached in the first trial.  (*Id.* at 6-7.)   The trial court
explained that Petitioner was "[w]rong" and noted that the trial
would go forward.  (*Id.* at 7.)

### D.   Petitioner's 2018 42 U.S.C. § 1983 Complaint

While awaiting his second trial, Petitioner filed a *pro se*
complaint in federal district court for the Eastern District of
New York against Suffolk County and the "S.C. Homicide Section"
pursuant to 42 U.S.C. § 1983.  *James v. Suffolk County*, No. 18-
CV-2826 (JFB), 2018 WL 10162136, at *1 (E.D.N.Y. Oct. 11, 2018).
The district court granted Petitioner *in forma pauperis* status to
proceed, but dismissed his complaints, noting that "there are
simply no facts from which the Court could reasonably construe a
policy or practice of denying timely trials to pretrial detainees"
and "even if the Court were to construe the complaint as against
the Suffolk County District Attorney, plaintiff's claims would be
barred by the Eleventh Amendment and absolute prosecutorial
immunity."  *Id.*, at *3.   Accordingly, Petitioner's complaint was
dismissed without leave to amend.  *Id.* at *4.

### III.   Trial

Jury selection for Petitioner's second trial began on
September 26, 2018, and concluded on October 15, 2018, at which
point the trial began.  ((ECF No. 18-27, Trial Transcript for

16

September 26; ECF No. 18-33, Trial Transcript for October 15, 2018.) Petitioner gave an opening statement in which he stated the following:

> My name is Christopher James. Basically you know I'm on trial fighting for my life for murder in the second degree.
> Basically when I was arrested April 24, 2016, in the comfort of my home, minding my business, walked out the door and was grabbed and taken from my comfort zone to deal with the problem we're facing today. But, I would like you to know before that I was in school, going to college for music and sound engineering, in which I have 13 college credits, and still trying to pursue that dream. And I am also a founder of the Almighty King Queen Nation, in which me, King Stone, and Queen Stone, are the organizers and supervisors of that open society. Basically it's all about human consciousness from Earth to Heaven and enlighten everybody to the universal laws and the true wisdom of God. It's very powerful. It's very true. Very real. I would like to also pursue that dream as well.
> As far as what's going on and why everybody is here today, honestly, I am not guilty of this crime. I knew the victim. We were acquaintances. I wouldn't say we were very close, you know, but, um, I knew him, and unfortunately things happened in which now I'm being blamed for, but I can promise you that I had nothing to do with it and I had no knowledge of it happening. Basically I just want you all to look at the evidence for what it is and make a very conscious decision when it's time for you.
> Thank you.

(ECF No. 18-33, Trial Transcript for October 15, 2018, at 54-55.) Petitioner continued to represent himself throughout the trial, although the trial court appointed a legal advisor to assist him with any questions he might have regarding the law. Petitioner cross-examined witnesses and otherwise participated in the trial,

17

although in one instance, he was admonished by the trial court for asking a witness whether she was "gay" and other inappropriate questions. (ECF No. 18-35, Trial Transcript for October 18, 2018, at 148-49.) Following the trial court's admonition, Petitioner generally complied with the trial court's directives.

At the conclusion of the prosecutor's case, Petitioner moved to dismiss for failure to present legally sufficient evidence, which the trial court denied. (ECF No. 18-39, Trial Transcript for October 24, 2018, at 36-37.) Petitioner subsequently offered a summation of two words: "Evil lives." (*Id.* at 53.) Following the prosecution's summation and the trial court's charge, the jury began deliberations on October 26, 2018, and reached a verdict of guilty the same day. (ECF No. 18-40, Trial Transcript for October 26, 2018, at 39.)

IV.   **Verdict and Sentence**

On October 26, 2018, the jury found Petitioner guilty on the sole count of the indictment, murder in the second degree. (*Id.* at 44.) On November 30, 2018, the trial court sentenced Petitioner to an indeterminate sentence of 25 years to life imprisonment. (ECF No. 18-14, Sentencing Transcript, at 10-11.)

**PROCEDURAL HISTORY**

I.   **State-Murder Conviction Direct Appeal**

Petitioner, represented by counsel, appealed his conviction to the Appellate Division, Second Department, arguing that (1) the hearing court improperly denied suppression of his statements to law enforcement officials made during transportation; (2) his guilt was not proven beyond a reasonable doubt and the verdict was against the weight of the evidence; (3) his retrial was barred by double jeopardy because no demonstration of "manifest necessity" was made prior to the declaration of a mistrial in his first trial; (4) the trial court abused its discretion in reconsidering an evidentiary ruling made during his first trial and admitting only a subset of text messages into evidence at retrial; (5) the trial court erred in directing him to provide foot impressions for forensic analysis; and (6) the trial court erred in allowing him to proceed *pro se* and failing to order a CPL article 730 examination to determine his competency to waive counsel. (State Opp. at ¶78.) Petitioner submitted a supplemental *pro se* brief raising two additional arguments: (1) he was denied his right to a speedy trial; and (2) the prosecutor's summation was improper. (*Id.*)

On December 1, 2021, the Appellate Division unanimously affirmed the judgment of conviction and sentence. *People v. James*, 157 N.Y.S.3d 307 (2d Dep't 2021). First, the Appellate Division agreed with the trial court's decision to deny suppression of

19

Petitioner's statement made during transportation and after the administration of *Miranda* warnings:

> The defendant initiated conversation with detectives after invoking his right to remain silent, and inculpated himself by asking a question which betrayed his knowledge of an essential fact not disclosed by the police. Contrary to the defendant's contention, his statements during transport were volunteered or spontaneous, and not the product of police conduct or questioning which reasonably could be expected to elicit an inculpatory response from him.

*Id.* at 308. Second, the Appellate Division held that Petitioner's "contention that there was legally insufficient evidence to support his conviction is unpreserved for appellate review" but that regardless, "viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to support his conviction." *Id.* (citation omitted). Continuing, the Appellate Division stated that "[u]pon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence." *Id.*

Third, the Appellate Division held that Petitioner "failed to preserve for appellate review his contentions that a demonstration of 'manifest necessity' was required prior to the declaration of a mistrial in his first trial," to prevent his retrial from being barred, but that such contentions were nonetheless "without merit." *Id.* Fourth, The Appellate Division found that the trial

court did not err in revisiting evidentiary rulings made during the first trial prior to the retrial:

> The Supreme Court providently exercised its discretion in reconsidering an evidentiary ruling made during the defendant's first trial regarding text messages between the defendant and the victim, and in granting the People's application to admit only certain of those text messages into evidence at the retrial. The subject text messages were probative of the victim's state of mind and, thus, of the defendant's motive for killing the victim. The defendant failed to establish that the text messages between the defendant and the victim that the court excluded at the retrial were relevant to a material fact, or otherwise met an exception to the rule against hearsay.

*Id.* at 309 (citations omitted).

Fifth, the Appellate Division found that Petitioner's "contention that his waiver of the right to counsel was not knowing, voluntary, and intelligent is without merit."  The Appellate Division explained its reasoning as follows:

> Here, the County Court engaged in a "searching inquiry" to clarify that the defendant understood the ramifications of proceeding pro se before accepting the defendant's waiver. The defendant's further contention that the court erred in failing to order a CPL article 730 examination to determine his competency to waive counsel is likewise without merit. A defendant's mental capacity may be taken into account in determining whether to permit the defendant to proceed pro se "although the trial court need not conduct a formal 'competency' hearing prior to adjudicating a self-representation request". In view of the record as a whole, the court had no reason to believe that the defendant suffered from a mental illness that affected his ability to waive counsel and proceed pro se.

*Id.* (citations omitted).    Finally, the Appellate Division held that the Petitioner's "remaining contentions, including those raised in his pro se supplemental brief, are unpreserved for appellate review and, in any event, without merit." *Id.*

On February 10, 2022, the New York Court of Appeals denied Petitioner's application for leave to appeal. *People v. James*, 184 N.E.3d 851 (N.Y. 2022) (Garcia, J.).

## II.   Petitioner's N.Y. Crim. Proc. Law § 440.10 Motions

On January 18, 2019, Petitioner filed his first motion under CPL § 440.10(1)(h) to vacate his judgment of conviction ("First § 440.10 motion").    (ECF No. 18-1, State Court Record Part II ("Record Pt. II"), at 152-61.)    Petitioner asserted that he had been denied the right of effective assistance of counsel in violation of the Sixth and Fourteenth Amendments, and specifically that he had a "lack of pre-trial hearings (only had a *Huntley* hearing), lack of communication, lack of knowledge on the law, lack of assistance from counsel." (*Id.* at 152-56.)    Defendant further claimed that he was denied effective assistance of counsel due to his *pro se* status and lack of knowledge regarding the law. (*Id.* at 156.)

By its Order dated March 7, 2019, the trial court denied Petitioner's First § 440.10 motion.    (Record Pt. I at 118.)    The Court found that the defendant had a legal advisor present at all

times during the trial who he could have consulted with, was properly advised of the risks of proceeding *pro se* but chose to do so anyway, and could not subsequently claim he was denied effective assistance of counsel due to his own legal representation. (*Id.*)

Petitioner subsequently brought a second CPL § 440.10 motion ("Second § 440.10 Motion") on March 4, 2019. (*Id.* at 114.) Petitioner claimed that he was "mentally unstable and was not in my right [state] of mind to undergo a trial, especially as my own lawyer." (*Id.*) Petitioner further stated that he suffered from bipolar disorder, social anxiety disorder, post-traumatic stress disorder, and schizophrenia, and was hospitalized in 2010 and 2012 for behavioral problems. (*Id.* at 114-15.) Petitioner offered examples of his behavior at trial, including asking a witness on cross-examination if she was gay, as evidence that he was mentally incompetent at trial. (*Id.*) Petitioner also requested an examination pursuant to CPL § 730.30. (*Id.*)

By Order dated August 1, 2019, the trial court denied Petitioner's Second § 440.10 motion. (*Id.* at 119.) The trial court noted that Petitioner had failed to sustain his burden of establishing that he was mentally incompetent at trial. (*Id.*) The trial court continued:

> The fact that some of the defendant's behavior during the trial may have been inappropriate, does not establish that the defendant was mentally incompetent. Furthermore, prior to proceeding pro se, this Court

> properly advised the defendant of all of the risks of
> proceeding pro se and conducted a searching inquiry to
> make sure that the defendant's waiver of his right to
> counsel was knowing, intelligent, and voluntary. In
> doing so, the Court advised the defendant numerous times
> of the dangers and disadvantages of proceeding pro se.
> However, the defendant continued to assert that he
> wished to proceed pro se. At no time during this
> searching inquiry did the defendant appear to be
> mentally incompetent.

(*Id.*) Regarding Petitioner's request for an examination pursuant

to CPL § 730.30, the trial court also denied it based on the

following findings:

> Where a court is of the opinion that a defendant may be
> incapacitated and unable to understand the proceedings
> or assist in his own defense, it must order that the
> defendant be examined pursuant to CPL 730.30. Here,
> there was never any request made by the defendant or his
> legal advisor, or by the defendant's attorney in his
> first trial, which ended in a mistrial, for such an
> examination. Furthermore, during the searching inquiry
> conducted by this Court after the defendant insisted
> upon representing himself at trial, the defendant
> appeared competent as he understood everything the Court
> asked him, and even communicated well with the Court.
> Therefore, a CPL 730.30 exam was unwarranted and
> continues to be unwarranted.

(*Id.* (citations omitted).)  The trial court rejected Petitioner's

contention that he had ineffective assistance of counsel as barred

under CPL § 440.10(3)(b) because it had been raised and denied in

Petitioner's First § 440.10 Motion.  (*Id.*)  Petitioner was denied

leave to appeal by the Appellate Division on May 22, 2020, and his

application for leave to appeal the Appellate Division's order was

dismissed by the Court of Appeals on August 25, 2020.  (State Opp. at ¶84.)

Petitioner subsequently brought a third CPL § 440.10 motion ("Third § 440.10 Motion") dated December 30, 2019.  (Record Pt. II at 40.)  Petitioner claimed that his conviction should be vacated on the grounds that his constitutional and state statutory right to a speedy trial was violated, and that his re-trial violated his constitutional right against double jeopardy.  (*Id.*)  The state responded in opposition on October 19, 2020.  (*Id.*)

By its Order dated January 19, 2021, the trial court denied Petitioner's Third § 440.10 motion.  (*Id.* at 41.)  The trial court noted that Petitioner currently had an appeal pending before the Appellate Division which raised the double jeopardy claim, so the motion must be denied with respect to that contention pursuant to CPL § 440.10(2)(b).  Regarding Petitioner's speedy trial claims, the Court noted that because "the defendant failed to raise this issue in his first two prior motions to vacate his judgment of conviction, the Court denies defendant's motion based on this ground.  In any event, since the right to a speedy trial is a record based claim, it is something that should be raised on a direct appeal, and not before this Court."  (*Id.* (citing CPL § 440.10(2)(b)).)

**III.   Habeas Corpus Petition**

On February 28, 2022, Petitioner filed this petition, raising a subset of the claims raised on appeal: (1) the trial court violated his constitutional right to a speedy trial, (2) the trial court violated his constitutional right to counsel by allowing him to represent himself *pro se* despite his "distorted" state of mind, (3) his retrial following an initial mistrial violated the double jeopardy clause of the Fifth Amendment, (4) the trial court erroneously ruled on an evidentiary issue between his first and second trial, (5) the trial court denied his right against self-incrimination, and (6) he is sovereign and his arrest was a violation of federal law.  (Pet. at 5, Pet. Letter at 1-3.)

On July 8, 2022, Respondent filed an affidavit in opposition to the petition, (State Opp.), as well as a memorandum of law, (ECF No. 16, State's Memorandum of Law in Opposition ("State Mem.")).  On July 15, 2022, Petitioner filed a reply noting that he chose not to make any reply to the Respondent, placing his "faith in the record as it is."  (ECF No. 23 ("Pet. Reply"), at 1.)  Petitioner subsequently moved on July 29, 2022, to be released on bond pending this Court's adjudication of his habeas petition, (ECF No. 24), which this Court denied on October 9, 2022, (Docket Order dated October 9, 2022).  Petitioner subsequently moved for discovery, (ECF No. 28), which was denied, and renewed his motion to be released on bond, (ECF No. 29), which was again denied on

November 2, 2022. Petitioner subsequently submitted other filings to this Court to serve as "evidence" of his mental health, and specifically regarding his disciplinary issues while incarcerated. (ECF Nos. 31, 32, 33, 34, 36.)

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits. 28 U.S.C. § 2254(d). A federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*; *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question

of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13. The court reviews the last reasoned state court decision in the case. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

State procedural default or failure to exhaust state court remedies will operate as a bar to review unless the petitioner can (1) establish cause for his or her default and actual prejudice resulting from the alleged violation of federal law, or (2) demonstrate that the failure to consider the petitioner's claims would result in a fundamental miscarriage of justice. *See Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012); *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011).

A petitioner can fulfill the cause requirement for default in two related ways. First, the petitioner can demonstrate that "some objective factor, external to Petitioner's defense, interfered with his ability to comply with the state's procedural rule." *Gutierrez*, 702 F.3d at 111. Alternatively, the petitioner can

28

establish cause by demonstrating futility — specifically, that "prior state case law has consistently rejected a particular constitutional claim." *Id.* at 112 (quoting *DiSimone v. Phillips*, 461 F.3d 181, 191 (2d Cir. 2006)). To establish prejudice, the petitioner must demonstrate that the alleged error resulted in "in "substantial disadvantage, infecting [the] entire trial with error of constitutional dimensions." *Id.* (internal quotation marks and citation omitted).

Even if the petitioner is unable to establish cause and prejudice, the court may excuse the procedural default if the petitioner can show that a fundamental miscarriage of justice would result, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (alteration in original) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

In reviewing the instant petition, the court is mindful that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (internal quotations and citations omitted); *Williams v. Kullman,* 722 F.2d 1048, 1050 (2d Cir. 1983) (noting that courts should review pro se habeas

petitions with a lenient eye).  Consequently, the court is obliged to interpret Petitioner's pleadings as raising the strongest arguments they suggest.  *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009).

A petitioner can seek federal habeas corpus relief only after he exhausts state court remedies and thus provides the state courts a fair and full opportunity to review the merits of the claim.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it."  *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

## DISCUSSION

### I.  Speedy Trial

Petitioner renews his claim that the trial court violated his constitutional right to a speedy trial.  Specifically, he claims that following his mistrial he "consistently asserted to Suffolk County Court that . . . [he] would like a 'speedy trial.'"  (Pet. at 5.)  Petitioner points to the "numerous" adjournments and postponements of his trial following his assertion that he would like a speedy trial, and states that the delay prejudiced him as it caused him "anxiety, fear, and anger" prior to his retrial.

30

(*Id.*)  Petitioner presented this claim on direct appeal to the Appellate Division, which found that Petitioner's speedy trial claim was "unpreserved for appellate review and, in any event, without merit."  *James*, 157 N.Y.S.3d at 309.

### A. State Law Speedy Trial Rights

To the extent Petitioner bases his claim on state law, specifically CPL § 30.30, such claims are not cognizable on Federal *habeas* review.  "A federal court may only review federal claims and lacks the power to review a conviction on state law speedy trial grounds."  *Clinkscales v. Collado*, No. 20-CV-3757 (RPK)(LB), 2021 WL 11448463, at *8 (E.D.N.Y. Oct. 12, 2021); *see also Cadilla v. Johnson*, 119 F. Supp. 2d 366, 374 (S.D.N.Y. 2000) ("Because C.P.L. § 30.30 is merely a state law provision requiring the prosecution to be ready for trial, a § 30.30 claim does not raise a federal constitutional claim.").  Petitioner also cites his Sixth Amendment right to a speedy trial in his Petition, however, so this Court will also examine his claim for a constitutional violation, accordingly.

### B. Procedural Bar

The Appellate Division found that Petitioner's claim of a speedy trial violation was unpreserved for appellate review, and this Court agrees.  Petitioner did emphasize at status conferences his desire to proceed to his retrial in an expedient manner.  For

31

example, on May 14, 2018, after stating his desire to proceed *pro se*, Petitioner stated "I just want to go to trial.  That's it. Whenever the People [are] ready."  (ECF No. 18-20, Hearing Transcript for May 14, 2018, at 8.)  Subsequently, following the hearing in which the trial court conducted an inquiry regarding Petitioner's desire to proceed *pro se*, the trial court asked Petitioner if he wished to "go to trial as early as the end of next week, beginning of the following week" and Petitioner stated "Yes."  (ECF No. 18-21, Hearing Transcript for May 16, 2018, at 30.)  After that, at the final pre-trial conference prior to Petitioner's second trial, on September 10, 2018, Petitioner raised his concern with the trial court that his right to a speedy trial had been violated because more than 180 days had elapsed since October 18, 2017.  (ECF No. 18-26, Hearing Transcript for September 10, 2018, at 3-5.)  The trial court disagreed, and the trial moved forward.  (*Id.*)

However, Petitioner did not move to dismiss the indictment when jury selection began on September 26, 2018, or prior to opening statements on October 15, 2018.  (*See generally* ECF Nos. 18-27, 18-33.)  In addition, Petitioner's objection on September 10, 2018, appears to have been made with regards to his *state* statutory speedy trial rights, and not his constitutional speedy trial rights, given the reference to 180 days.  *See* CPL § 30.30

32

(listing the time limitation for prosecution to be ready for a felony trial as "six months of the commencement of a criminal action"). Accordingly, Petitioner's claim regarding a constitutional violation was not preserved for state appellate review. *People v. Mandes*, 91 N.Y.S.3d 194, 197 (2d Dep't 2019) ("insofar as the issue is raised for the first time on appeal, the defendant's contention that his constitutional speedy trial rights were violated is unpreserved for appellate review"); *see also People v. Card*, 968 N.Y.S.2d 803 (2d Dep't 2013) (because "the defendant never made a pretrial motion to dismiss the indictment on the ground that he was denied his statutory right to a speedy trial, he waived his right to a dismissal on statutory speedy trial grounds"). Because the Appellate Division clearly and expressly stated that its judgment rested on a state procedural bar, federal habeas review of the claim is foreclosed unless Petitioner can show either "cause for the default and prejudice," or that "failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001). Here, Petitioner fails to demonstrate cause and prejudice, or that a fundamental miscarriage of justice would result from the procedural bar.

**C. Merits**

Even if the Court were to review Petitioner's speedy trial claim on constitutional grounds, the claim would be denied as without merit because the state court's decision was not contrary to or an unreasonable application of clearly established Federal law. "[T]he Supreme Court [has] articulated four factors to be considered in determining whether a defendant's constitutional right to a speedy trial had been violated: 'Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" *United States v. Howard*, 443 F. App'x 596, 599 (2d Cir. 2011) (quoting *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

As noted previously, much of the delay between Petitioner's mistrial being declared and his subsequent retrial was due to Petitioner's change in counsel, his subsequent decision to proceed *pro se*, and the trial court's efforts to ensure Petitioner was appropriately notified of the risks and prepared to proceed with his self-representation. Some of the delays were attributable to the trial court's own trial schedule, (*see* ECF No. 18-25, Hearing Transcript for August 14, 2018), or the prosecutor's other scheduled trials, (*see* ECF No. 18-24, Hearing Transcript for June 18, 2018). While the Court does not discount Petitioner's claims about the toll of pre-trial confinement on his mental wellbeing, Petitioner does not cite any other prejudice that resulted from

34

the delay between his trial and retrial. "Of course, incarceration in the pretrial period [is] a hardship and must be included in the assessment of 'prejudice.'" *United States v. Vasquez*, 918 F.2d 329, 338 (2d Cir. 1990). However, Petitioner does not cite that he suffered "the 'most serious' form of prejudice, namely, prejudice to his defense." *Smith v. La Clair*, 353 F. App'x 486, 489 (2d Cir. 2009) (quoting *Barker,* 407 U.S. at 532); *see also United States v. Abad*, 514 F.3d 271, 275 (2d Cir. 2008) (stating that *Barker*'s prejudice prong "is concerned with impediments to the ability of the defense to make its own case").

Altogether, the Plaintiff waited approximately 11 months from the time of his mistrial in October 2017 to the time that his trial restarted with jury selection in September 2018. (Record Pt. I at 1-2.) "While an eleven-month delay may be presumptively prejudicial, it does not, *per se*, establish a violation of petitioner's Sixth Amendment right to a speedy trial." *Rodriguez v. Superintendent, Collins Corr. Facility*, 549 F. Supp. 2d 226, 239 (N.D.N.Y. 2008). When analyzed under the remaining three *Barker* factors, the delay in the instant case did not violate Petitioner's constitutional right to a speedy trial. The reason for the delay in Petitioner's retrial was primarily due to the trial court's efforts to ensure Petitioner was adequately represented – first, by allowing newly-appointed counsel time to

35

prepare and review the case file following relief of Petitioner's original trial counsel; and second, by taking the time to conduct an inquiry regarding Petitioner's desire to proceed *pro se* and ensure Petitioner had legal counsel available on standby.  (*See, e.g.,* ECF No. 18-12, Trial Transcript for October 18, 2017, at 8-9 (Petitioner confirms he is comfortable with new counsel taking over and being "ready sometime after the new year"); ECF No. 18-19, Hearing Transcript for May 9, 2018, at 3-4 (Petitioner asks to proceed *pro se* rather than have new counsel appointed when defense counsel requested to be relieved due to "family issues").)  Petitioner cites no evidence of any undue delay on the part of the prosecution, and in the absence of further details, there does not appear to have been any "deliberate attempt to delay the trial in order to hamper the defense."  *Barker*, 407 U.S. at 531.

Accordingly, because the delay was not deliberate on the part of the prosecution, and there is no indication of actual prejudice, Petitioner does not sufficiently allege a violation of his Constitutional speedy trial rights.  Accordingly, even if Petitioner's claim were not procedurally defaulted, it is without merit.

## II.  Petitioner's Competence to Proceed Pro Se

Petitioner renews his claim that he was not mentally competent at his second trial and that the trial court abused its discretion

36

when it permitted him to proceed *pro se* with his "distorted" state of mind.[5] (Pet. at 5.) The Appellate Division's decision rejecting Petitioner's claims and finding that "the court had no reason to believe that the defendant suffered from a mental illness that affected his ability to waive counsel and proceed pro se" is entitled to AEDPA deference. *James*, 157 N.Y.S.3d at 309. As a result, Petitioner must show that the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

For the foregoing reasons, this Court finds that the Appellate Division's decision regarding Petitioner's competence to proceed *pro* se was consistent with clearly established federal law and was based on a reasonable determination of the facts in light of the record as a whole.

### A. Waiver of the Right to Counsel

The right to counsel is explicitly safeguarded by the Sixth Amendment, which states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel

---

[5] As noted by the Respondent, Petitioner does not raise this claim directly, but rather includes it as a subset of his speedy trial claim. The Court liberally interprets the claim as a separate constitutional violation in light of Petitioner's *pro se* status. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

for his defence." U.S. Const. amend. VI. "It is clearly established federal law as determined by the Supreme Court that no defendant can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel." *Dallio v. Spitzer*, 343 F.3d 553, 560 (2d Cir. 2003) (citing *Powell v. Alabama*, 287 U.S. 45 (1932)). "Although not expressly stated in the Sixth Amendment, a clearly established corollary to the right to counsel is the right to dispense with a lawyer's help, and to represent oneself." *Id.* (internal quotation marks and citations omitted). In *Faretta v. California,* the Supreme Court vacated a state court conviction because a defendant's request to proceed *pro se* was denied, explaining:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. . . . Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment.

422 U.S. 806, 819 (1975).

So long as a criminal defendant "knowingly, voluntarily, and unequivocally" waives his right to appointed counsel," considerations such as a "lack of legal training, college education, and skills" do not provide a basis to refuse such a waiver. *Williams v. Bartlett*, 44 F.3d 95, 99 (2d Cir. 1994). Notwithstanding a defendant's right to proceed *pro se*, "the

Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so," and may in some instances insist on representation by counsel. *Indiana v. Edwards*, 554 U.S. 164, 177–78 (2008).

The Supreme Court has explained that "a competency determination is necessary only when a court has reason to doubt the defendant's competence." *Godinez v. Moran*, 509 U.S. 389, 401 n.13 (1993). "There are . . . no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." *Drope v. Missouri*, 420 U.S. 162, 180 (1975). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required." *Id.* (citing *Pate v. Robinson*, 383 U.S. 375 (1966)). Further, "the trial court is required to consider only that evidence actually before it when deciding whether a competency hearing is required." *Nicks v. United States*, 955 F.2d 161, 169 (2d Cir. 1992) (citations omitted).

### B. Petitioner's Waiver of the Right to Counsel

As noted by the Appellate Division, the trial court "engaged in a 'searching inquiry' to clarify that the defendant understood

the ramifications of proceeding pro se before accepting the defendant's waiver." *James*, 157 N.Y.S.3d at 309.  This Court agrees with the Appellate Division's characterization of the record.  Most importantly, after Petitioner asserted his desire to proceed *pro se* at a court conference on May 9, 2018, the trial court appropriately scheduled a separate hearing to ensure Petitioner's waiver was knowing, voluntary, and intelligent, prior to accepting the Petitioner's waiver of his right to counsel.  (ECF No. 18-19, Hearing Transcript for May 9, 2018, at 5.)  The trial court appropriately ensured that counsel was available for Petitioner to consult prior to the hearing, both regarding the waiver and additional evidence being offered by the prosecution.  (ECF No. 18-20, Hearing Transcript for May 14, 2018, at 6.)

Subsequently, at the conference on May 16, 2018, the trial court explained to Petitioner, after confirming he still wished to proceed *pro se*, that "before permitting you to give up that right and proceed as your own lawyer, I must decide whether you fully understand the significance and consequences of doing so."  (ECF No. 18-21, Hearing Transcript for May 16, 2018, at 6.)  The trial court went on to conduct an extensive inquiry regarding Petitioner's waiver of his right to counsel, and also devoted significant time to warning Petitioner regarding the risks of proceeding to trial *pro se*.  (*See generally id.*)  At the conclusion

40

of the hearing, Petitioner reaffirmed his desire to proceed *pro se*:

> THE COURT: . . . I can't force you to have an attorney, but I just want to make sure that you're making this decision fully aware of the ramifications that can take place as a result of this decision.
> Are you aware of that?
> THE DEFENDANT: Yes.
> THE COURT: And you still want to go forward and represent yourself?
> THE DEFENDANT: Yes.

(*Id.* at 23.)   The trial court accepted Petitioner's request to proceed *pro se*, but nonetheless assigned a legal advisor to be present for Petitioner to advise during the trial.   Throughout the subsequent pre-trial proceedings and during the trial, Petitioner never wavered in his desire to proceed *pro se*, or gave any indication to the trial court that he was not competent to continue making such a waiver (as discussed further *infra*).   Accordingly, the Appellate Division's decision rejecting Petitioner's claim was not an "unreasonable application of, clearly established Federal law" nor was the decision "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).

### C. Proceeding to Trial without a Competency Hearing

Petitioner contended in his direct appeal that the Court erred in failing to order an examination to determine his competency to waive counsel, which the Appellate Division rejected.   Although

41

Petitioner does not raise the claim directly in his brief, this Court will examine the issue as ancillary to Petitioner's claims about his "distorted" state of mind.

When determining whether to order a hearing regarding Petitioner's competence, the trial court was "required to consider only that evidence actually before it." *Nicks*, 955 F.2d at 169. At no point prior to Petitioner's decision to proceed *pro se* was there any evidence or indication that Petitioner was not competent to stand trial. Neither of the two attorneys tasked with representing Petitioner called Petitioner's competency into question or moved for a competency examination, which courts in this district have considered an important factual consideration. *See, e.g., Rodriguez v. Lamanna*, No. 18-CV-07196 (ENV), 2020 WL 4926358, at *4 (E.D.N.Y. Aug. 19, 2020) ("quite significantly, as the record memorializes, neither of the two lawyers who appeared on behalf of [Petitioner] suggested that [Petitioner] was incompetent to stand trial, assist in his own defense or enter a guilty plea; nor did either of them at any time, during the pendency of these proceedings in the trial court through the imposition of sentence, request that a competency hearing be ordered"). Furthermore, though Petitioner had occasional instances of disruptive behavior during the trial, following admonishment by the trial court, Petitioner complied and resumed

42

appropriate conduct at the proceedings. (*See, e.g.,* ECF No. 18-35, Trial Transcript for October 18, 2018, at 148-49.)   Viewing the record as a whole, there is no evidence to suggest that the Appellate Division's decision rejecting Petitioner's claim was an "unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).

## III.   Double Jeopardy

Petitioner renews his claim that his retrial following his initial mistrial violated the double jeopardy clause of the Fifth Amendment.   (Pet. Letter at 1.)   Petitioner presented this claim on direct appeal to the Appellate Division, which found that Petitioner "failed to preserve for appellate review his contentions that a demonstration of 'manifest necessity' was required prior to the declaration of a mistrial in his first trial, and that his retrial was barred by double jeopardy because no such manifest necessity for a retrial was established" and, "[i]n any event, these contentions are without merit."   *James*, 157 N.Y.S.3d at 308.

### A. Double Jeopardy

The Double Jeopardy Clause of the U.S. Constitution states: "[N]or shall any person be subject for the same offense to be twice

put in jeopardy of life or limb." U.S. Const. amend. V. The Supreme Court has described the clause as "afford[ing] a defendant three basic protections: It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Ohio v. Johnson*, 467 U.S. 493, 497-98 (1984) (quoting *Brown v. Ohio*, 432 U.S. 161, 165 (1977)). The purpose behind these "protections stem[s] from the underlying premise that a defendant should not be twice tried or punished for the same offense." *Schiro v. Farley*, 510 U.S. 222, 229 (1994). The clause thus "operates as a bar against repeated attempts to convict, with consequent subjection of the defendant to embarrassment, expense, anxiety, and insecurity, and the possibility that he may be found guilty even though innocent" so that "[w]hen a defendant has been acquitted, the Clause guarantees that the State shall not be permitted to make repeated attempts to convict him." *Id.* at 229-30 (internal quotation marks and citations omitted); *see also Johnson*, 467 U.S. at 498 (describing the bar to retrial following acquittal or conviction).

"Where a defendant either objects or fails to consent to a trial court's declaration of a mistrial, double jeopardy will bar a second prosecution unless there was a 'manifest necessity' for

the mistrial." *Maula v. Freckleton*, 972 F.2d 27, 28–29 (2d Cir. 1992) (citing *United States v. Dinitz*, 424 U.S. 600, 606–07 (1976)). "No 'manifest necessity' analysis is required, however, when a defendant requests a mistrial, or consents to one." *Id.* at 29; *see also United States v. Huang*, 960 F.2d 1128, 1133 (2d Cir. 1992) ("[T]he Double Jeopardy Clause guards against government oppression; it does not relieve a defendant of the consequences of his voluntary choice to accept a mistrial.") Accordingly, when a defendant in a criminal prosecution "consent[s] to the mistrial, double jeopardy could not attach unless the prosecution intentionally provoked the mistrial." *United States v. Bright,* 356 F. App'x 474, 476 (2d Cir. 2009) (citing *Oregon v. Kennedy*, 456 U.S. 667, 673 (1982)). Consent may be inferred from a failure to object. *Maula*, 972 F.2d at 29 ("Inferring consent from counsel's failure to object in this case is not only consistent with the requirements of the double jeopardy clause; it also tracks the general principle applied in other areas of trial practice, when failure to object to a ruling, which at the time it is made or proposed could readily be changed, will bar future attempts to review that ruling.")

### B. Procedural Bar

The Appellate Division found that Petitioner's claim of a double jeopardy violation was unpreserved for appellate review.

However, at the final pre-trial conference prior to Petitioner's second trial, on September 10, 2018, Petitioner raised his concern with the trial court that a retrial would violate his double jeopardy rights:

> THE DEFENDANT: Why it's illegal right now for me to be held here. Because if I were go to trial –
> THE COURT: No, it's not. There was a mistrial declared. Double jeopardy does not attach.
> THE DEFENDANT: I'll read you this.
> THE COURT: Great.
> THE DEFENDANT: [Reads from *People v. Zendano*, 136 N.Y.S.2d 106, 108 (Erie Co. Ct. 1954)] . . . Basically improper conclusion of the trial is mistrial. A verdict wasn't reached. So it will be double jeopardy for me to go back to trial.
> THE COURT: . . . . Wrong. See you on the 24th.

(ECF No. 18-26, Hearing Transcript for September 10, 2018, at 6-7.) While Petitioner may not have perfectly complied with New York's criminal procedure rules for raising a double jeopardy objection, there is no "indication that formally perfect compliance with the Rules would have changed the trial court's decision." *Lee v. Kemna*, 534 U.S. 362, 387 (2002). The trial court clearly understood and decided the legal question presented – whether Petitioner's retrial would violate his double jeopardy rights. As such, and in light of the Appellate Division's alternative merits-based decision, this Court will address Petitioner's claim on the merits.

**C. Merits**

Petitioner's claims that his retrial was barred by double jeopardy absent a finding of manifest necessity by the trial court are without merit and were properly denied by the Appellate Division.  Upon receiving notice from the trial court in the first trial that a juror had fallen ill, was at the hospital, and might not be able to continue deliberating, the trial court asked defense counsel what they wished to do regarding the remaining alternate jurors:

> [DEFENSE COUNSEL]: Judge, I have spoken to my client, and we are going to request that the alternates be discharged at this point.
> THE COURT: Okay. So under no circumstances would you allow either one of those alternates to replace any juror and, in particular, Juror Number 9.
> [DEFENSE COUNSEL]: Correct.
> THE COURT: Okay. Is that correct, Mr. James?
> THE DEFENDANT: Yes.

(ECF No. 18-32, Trial Transcript for October 11, 2017, at 7-8.) Subsequently, the juror who had fallen ill called the trial court, and a phone conference was held with all parties, at which the juror stated that she would not be able to continue with jury service on the advice of her physician.  (*Id.* at 16-17.)  The trial court allowed defense counsel time to confer with Petitioner regarding the situation, and to discuss whether Petitioner would like to proceed with the remaining eleven jurors, as the alternates had been discharged.  (*Id.* at 19.)  Subsequently, the trial court stated:

THE COURT: . . . [Defense Counsel], I'm sure that you
just privately conferred with your client, telling him
about the conversation that we just had with Juror Number
9 that was on-the-record in chambers, wherein she
indicated to us that she had seen her regular doctor
this afternoon and was being advised by that doctor and
is being advised by that doctor that she is not to come
back to jury duty because of her heart condition, I think
is the way it was referred to.
[DEFENSE COUNSEL]: Yes, Judge.
THE COURT: And, in fact, she's being referred by that
doctor to a cardiologist to followup. And I think we
both heard from Juror Number 9 indicating that clearly
she was disabled at this point and being strenuously
advised by her doctor not to return to jury duty.
Am I describing that conversation correctly?
[DEFENSE COUNSEL]: Yes, your Honor.
[THE PROSECUTOR]: Yes, your Honor.
THE COURT: Okay. So, [Defense Counsel], do you wish to
be heard at this point?
[DEFENSE COUNSEL]: Nothing further, Judge.
THE COURT: [Prosecution]?
[THE PROSECUTOR]: No, your Honor.
THE COURT: All right. We are in a position where clearly
[Juror Number 9], is incapacitated and physically unable
to proceed with this trial. So even without an
application by either side, I'm in a position where I
need to declare a mistrial in this case.
Anybody wish to be heard further before we bring the
jury out?
[THE PROSECUTOR]: No, your Honor.
[DEFENSE COUNSEL]: Nothing further, Judge.

(*Id.* at 20-22.)  The trial court subsequently declared a mistrial

without objection from either party.  (*Id.* at 23-24.)

Reviewing the record, it is clear that the mistrial was

declared without objection and on consent of both parties.  As

such, no finding of "manifest necessity" was required by the court

to allow a retrial to proceed without violating double jeopardy.

*Maula*, 972 F.2d at 29.  Furthermore, Petitioner does not allege,

48

and the record does not reflect, that the prosecution or the trial court acted in a "a manner intended to provoke a defendant to move for a mistrial." *Id.* Accordingly, Petitioner's double jeopardy claim presents no basis for habeas relief, and the Appellate Division's decision rejecting it was not an "unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## IV.   **Evidentiary Ruling regarding Foot Impressions**

Petitioner argues that the trial court erroneously issued an order allowing the prosecution to take foot impressions from petitioner. (Pet. Letter at 2.) Petitioner presented this claim on direct appeal to the Appellate Division, which found that the claim was "unpreserved for appellate review and, in any event, without merit." *People v. James*, 157 N.Y.S.3d at 309.

### A. Habeas Review of State Evidentiary Rulings

Where a petitioner alleges an incorrect evidentiary ruling at trial, this Court must first ascertain whether the state court ruling was proper under state law; if the ruling correctly applied the state evidentiary rule, there is no constitutional violation. *Delancy v. Lee*, No. 15-CV-891 (RRM) (CLP), 2019 WL 9051134, at *17 (E.D.N.Y. Nov. 4, 2019), *report and recommendation adopted*, 2020 WL 3084285 (E.D.N.Y. June 10, 2020). Second, if this Court finds

49

the evidentiary ruling was made in error, it must determine whether the error violated a constitutional right. *Id.* For a ruling to rise to such a level, the error must have deprived petitioner of a fundamentally fair trial. *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985). Courts have clarified that such deprivation occurs when the error in question has removed reasonable doubt that was otherwise present in the context of the entire record. *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (citing *United States v. Agurs,* 427 U.S. 97, 112-13 (1976)).

Under New York state law, for a court to issue an order for a suspect in a homicide investigation to supply the prosecution "with corporeal evidence," the prosecution must establish: "(1) probable cause to believe the suspect has committed the crime, (2) a "clear indication" that relevant material evidence will be found, and (3) the method used to secure it is safe and reliable." *Matter of Abe A.*, 437 N.E.2d 265, 266 (N.Y. 1982). "In addition, the issuing court must weigh the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect's constitutional right to be free from bodily intrusion on the other." *Id.*

**B. Procedural Bar**

50

The Appellate Division found that Petitioner's claim regarding the taking of foot impressions was not preserved for appellate review, and this Court agrees.

Subsequent to the mistrial in Petitioner's first trial, the prosecution moved the trial court for an order pursuant to CPL § 240.40(2)(b)(v) compelling Petitioner to permit the taking of foot impressions. (Record Pt. I at 121.)  Petitioner, through counsel, opposed the motion, arguing that probable cause did not exist to believe Petitioner committed the crime.  (*Id.*)  The trial court granted the order requested by the prosecution, finding that probable cause existed "to believe the defendant committed the crime" and that the prosecution "established a clear indication that relevant material evidence will be found."  (*Id.*)  Specifically, the trial court cited the DNA evidence connecting Petitioner to the crime scene, Petitioner's incriminating statements to detectives, and the fact that an expert testified at the first trial that "the foot impressions [inside the bathroom] could not have belonged to the victim."  (*Id.* at 122.)  After the order was entered, Petitioner did not move to appeal the order or otherwise object to the entry of the foot impressions into evidence at trial.  (ECF No. 18-34, Trial Transcript for October 16, 2018, at 91.)  Accordingly, as noted by the Appellate Division, Petitioner's claim was not properly preserved.  *See Richardson v.*

51

*Greene*, 497 F.3d 212, 218 (2d Cir. 2007) (CPL § 470.05(2) "requires, at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error.")

Because the Appellate Division clearly and expressly stated that its judgment rested on a state procedural bar, federal habeas review of the claim is foreclosed unless Petitioner can show either "cause for the default and prejudice," or that "failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001). Here, Petitioner fails to demonstrate cause and prejudice, or that a fundamental miscarriage of justice would result from the procedural bar.

### C. Merits

Even if this Court were to review Petitioner's claim regarding the taking of foot impressions on the merits, his claim would fail. Contrary to Petitioner's claims, the trial court reasonably determined that taking his foot impressions would result in "relevant material evidence" – specifically, impressions of his feet that could be compared against "the crime scene-photographs of sock clad bloodied footprints." (Record Pt. I at 122.)

Combined with the fact that probable cause existed to believe Petitioner committed the crime in question, and given that there was no serious challenge that the method used to create the foot impressions was not "safe and reliable," the trial court reasonably determined that an order under CPL § 240.40(2)(b)(V) was appropriate. (*Id.* at 121-22.); *see also Matter of Abe A.*, 437 N.E.2d at 266. As a result, even if Petitioner's claim were not procedurally defaulted, it is without merit.

### V. <u>Right Against Self-Incrimination</u>

Petitioner renews a claim made in his supplemental *pro se* appellate brief that the prosecution made inappropriate remarks during summation, that the trial court did not appropriately address the remarks, and that Petitioner's only recourse would have been to incriminate himself by rebutting the remarks directly. (Pet. Letter at 2-3.) Petitioner presented this claim on direct appeal to the Appellate Division, which found that Petitioner's claim was "unpreserved for appellate review and, in any event, without merit." *People v. James*, 157 N.Y.S.3d at 309.

### A. Background

Although Petitioner does not cite directly to the record regarding the portion of the summation with which he takes issue, the Court liberally construes his argument and will examine his argument in the strongest light possible given his *pro se* status.

*See Erickson v. Pardus,* 551 U.S. 89, 94 (2007).  Following the prosecutor's summation at Petitioner's second trial, after conferring with his legal advisor, Petitioner objected to the summation "specifically [the prosecutor] using impermissible burden shifting."  The trial court responded as follows:

> THE COURT: Are you referring to the portion where she indicated only you could be the source of some information?
> THE DEFENDANT: Yes.
> THE COURT: Mr. James, if you're asking for a mistrial, I'm going to deny that application. However, if you wish to bring that to the attention of the jury before they leave, I'll bring them back and tell them to absolutely disregard that portion of [the prosecutor's] summations. [The trial court orders the jury to return, and both sides waive the roll call.]
> THE COURT: Ladies and gentlemen, at a certain point in [the prosecutor's] summations she indicated something to the effect that only Mr. James could be the source of certain information. I don't recall exactly the quote, but please understand, you are to disregard that portion of her summations absolutely. The defendant is not required to say anything, do anything, or prove anything. It is the obligation of the People to prove this case beyond a reasonable doubt. The defendant has no obligation to do anything and he's not required to be any source of any information whatsoever.
> Does everybody understand that?
> If you remember what she said, you are absolutely to disregard that, put it out of your mind and do not consider it one bit.

(ECF No. 18-39, Trial Transcript for October 24, 2018, at 94-96.) During the summation, the prosecutor stated the following, which may have been the basis of the Petitioner's objection:

> What does [Petitioner] tell you in [the car while speaking to Detective Mahan]?

He tells you again, I've never been at [the victim's]
place. Same thing that he said six years earlier. But,
the more important thing in that conversation is he says,
how are you going to charge with me murder when the
weapon was never recovered. How does he know that? How
does he know that? The only people that know that are
the Suffolk County Police Department and the person who
killed Kevin Pierson, and that person is Christopher
James.
. . .
Now, I told you from the beginning I'm not going to give
you motive. I'm not going to be able to answer why. The
only person that can tell you why is sitting right there.
I can't tell you why. The evidence can't tell you why.
It can tell you how and it can tell you who.

(*Id.* at 80-83.)  Petitioner did not raise any further objection to

the prosecutor's summation and did not object to the curative

instruction given by the trial court.  (*Id.* at 94-95.)

### B. Procedural Bar

The Appellate Division found that Petitioner's claim

regarding the prosecutor's summation was not preserved for

appellate review, and this Court agrees.

As discussed *supra*, though Petitioner objected to the

prosecutor's summation at trial, he did not make it clear he was

moving for a mistrial and did not object to the curative

instruction offered by the trial court.  Accordingly, Petitioner's

claim was not properly preserved.  *See Richardson v. Greene*, 497

F.3d 212, 218 (2d Cir. 2007).

Because the Appellate Division clearly and expressly stated

that its judgment rested on a state procedural bar, federal habeas

55

review of the claim is foreclosed unless Petitioner can show either "cause for the default and prejudice," or that "failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001). Here, Petitioner fails to demonstrate cause and prejudice, or that a fundamental miscarriage of justice would result from the procedural bar.

### C. Merits

Petitioner claims that the prosecutor's statement in summation required a "mandatory" rebuttal as its only cure, and as such, violated his right against self-incrimination. However, Petitioner does not cite any authority for his claim, and this Court is not aware of any that holds the same. In the alternative, the Court will examine Petitioner's claim as alleging prosecutorial misconduct that deprived him of a fundamentally fair trial.

As a preliminary matter, the trial court warned Petitioner regarding the risks of representing himself, and the fact that it would be "difficult" to deliver an opening and summation "where you'll likely have to speak about your alleged conduct and in doing so, you run the risk of saying something in such a way as to make it appear you are guilty." (ECF No. 18-21, Hearing Transcript for May 16, 2018, at 13-14.) Petitioner stated that he understood the

risks and nonetheless desired to proceed *pro se*. Regardless, Petitioner had the right to testify and to decline to testify if he so desired, and "the decision whether to testify belongs to the defendant." *Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir. 1997).

Notwithstanding the above, it is well settled law that the prosecution may not improperly comment on the accused's silence during a trial. *See United States v. Whitten*, 610 F.3d 168, 199 (2d Cir. 2010) ("The test governing whether a prosecutor's statements amount to an improper comment on the accused's silence in violation of the Fifth Amendment looks at the statements in context and examines whether they naturally and necessarily would be interpreted by the jury as a comment on the defendant's failure to testify.") In the present context of habeas review, a federal court reviewing a claim of prosecutorial misconduct must find that "the prosecutor's comments constituted more than mere trial error, and were instead so egregious as to violate the defendant's due process rights," in order to grant relief." *Tankleff v. Senkowski*, 135 F.3d 232, 252 (2d Cir. 1998); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments 'so

infected the trial with unfairness as to make the resulting conviction a denial of due process.'")).

As explained by the Second Circuit in *Tankleff*, "[t]o be entitled to relief, [petitioner] must show 'that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.'" *Tankleff*, 135 F.3d at 252 (quoting *Bentley v. Scully*, 41 F.3d 818, 823 (2d Cir. 1994)). "To determine whether the alleged comments rise to the level of a violation of petitioner's right to due process, reviewing courts routinely inquire as to: (1) the severity of the misconduct; (2) the nature of the curative measures taken to remedy the prejudice, if any, and (3) the certainty of the conviction absent the improper conduct. *Morales v. Walsh*, No. 05-CV-2251 (DGT), 2008 WL 2047632, at *6 (E.D.N.Y. May 12, 2008) (citing *Tankleff*, 135 F.3d at 252).

Here, it is clear that relief is not warranted. Although the prosecutor does appear to have indirectly commented on Petitioner's decision not to testify, the statements made were quite limited, and were promptly addressed by the trial court with an instruction to the jury after Petitioner's objection. The Petitioner did not object to the curative instructions that were given, further indicating that the trial court had cured any error to his satisfaction. Thus, given the instructions to the jury by

the trial court, and viewing the trial record overall, the Court cannot conclude that the prosecutor's few improper comments during summation deprived petitioner of a fundamentally fair trial.   In conclusion, even if Petitioner's claim were not procedurally defaulted, it would be without merit.

## VI.   Jurisdiction of the Trial Court

Petitioner raises for the first time the claim that he is "sovereign" and as such, his arrest was a violation of federal law and an "intrusion" on his "being" without "just compensation." (Pet. Letter at 3.)  Petitioner's claim is procedurally barred as it was not presented before the trial court or on direct appeal, and is, in any event, frivolous.

### A. Analysis

Respondent notes that Petitioner failed to fairly present his sovereignty claim to the highest state court from which review is available, and this Court agrees.  (State Mem. at 31.)  Petitioner failed to raise the issue of his alleged "sovereign" status in any of his appeals in state court, leaving the issue unexhausted.  *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (to exhaust a claim petitioner must fairly present claim to highest court of the state before filing federal writ).   Given Petitioner has already completely litigated his direct appeal, he is without any state remedy, making the claim procedurally defaulted.  *See Aparicio v.*

59

*Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) ("when the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, federal habeas courts also must deem the claims procedurally defaulted"). As discussed previously, Petitioner would be required to either "show cause for the default and prejudice, or demonstrate that failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)" in order to present a procedurally defaulted claim for merits review. *Id.* Petitioner has failed to make any such showing.

Nonetheless, Petitioner's claim would clearly fail on the merits. As the Second Circuit has described, "sovereign citizens" are "a loosely affiliated group who believe that the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior." *United States v. Ulloa*, 511 F. App'x 105, 106 n.1 (2d Cir. 2013). While Petitioner does not directly link himself to the larger sovereign citizen movement, and appears to have created declared himself a sovereign, the Court notes that the same legal analysis applies. Similar arguments regarding the "sovereignty" of an individual have been repeatedly rejected by courts within the Second Circuit. *See,*

*e.g., Santana v. United States*, No. 16-CV-5750 (PKC), 2017 WL 2470834, at \*2 (S.D.N.Y. June 6, 2017) ("[sovereign citizen] theories on which [petitioner] bases these arguments have been uniformly rejected by the courts as legally invalid and frivolous"); *Paul v. New York*, No. 13-CV-5047 (SJF), 2013 WL 5973138, at \*3 (E.D.N.Y. Nov. 5, 2013) (finding that "sovereign citizens" are "subject to the laws of the jurisdiction in which they reside").  In the absence of any persuasive legal authority to the contrary from Petitioner, this Court joins others in this circuit who have dismissed "sovereign citizen" theories as legally frivolous, and finds that Petitioner's claim fails on the merits.

**CONCLUSION**

For the foregoing reasons, Petitioner's Section 2254 petition is respectfully **denied** and **dismissed** in its entirety.  Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (discussing certificate of appealability standard); Rules Governing Section 2254 and 2255 Cases, Rule 11 ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").

The Clerk of Court is directed to enter judgment in favor of Respondent and close this case.  In accordance with 28 U.S.C. §

1915(a)(3), the Court certifies that any appeal from this order would not be taken in good faith and thus denies *in forma pauperis* status for the purposes of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).  The Clerk of Court is respectfully requested to serve a copy of this Order and the Judgment on Petitioner and note such service on the docket by February 2, 2024.

**SO ORDERED**

Dated:      February 1, 2024
            Brooklyn, New York

_____
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York